SERGEANT *v.* GRAND RAPIDS & INDIANA RAILWAY CO.

1. Master and Servant—Personal Injuries — Railroads — Evidence—Question for Jury.

In an action by a railroad switchman to recover for personal injuries due to being caught between the beam at the front of a switch engine and a post in a fence through which a side track passed into a building as he jumped off the footboard of the engine on which he had been riding, *held*, on conflicting evidence, that it was a question for the jury whether the engine was operated at an excessive speed.

2. Same—Personal Injuries—Contributory Negligence.

Recovery could not be denied on the ground of contributory negligence of plaintiff in riding on the footboard of the engine where the only evidence on the subject was that of the engineer that the supposition was that the footboard was a proper place for switchmen to be and that he had a right to expect them there.[1]

3. Same—Personal Injuries—Negligence—Instructions.

An instruction that the jury would be warranted in finding that it was the duty of the engineer to stop if steam was blowing in his face and obscured his vision for any considerable length of time; that it was defendant's claim that the engineer was exercising due care and was on the lookout for signals and did not see any; that he did not see any and that the engine was not being run at a negligent rate of speed, and that if this was the case, it was for the jury to determine whether it was his duty to stop until his vision was cleared, was correct.

4. Appeal and Error—Excessive Verdicts—Denial of Motion for New Trial.

Where the question of excessive verdict is raised in a personal injury action, by a motion for new trial, and the motion is denied, and the reasons therefor filed, but no exception is filed, the question will not be considered on appeal.

[1]On contributory negligence of railroad employee in riding on engine, see note in 14 L. R. A. 552.

198—Mich.—25.

5. TRIAL—ARGUMENT OF COUNSEL—HARMLESS ERROR.

 The misconduct of counsel for plaintiff in a personal injury
 action, in referring to the circumstances of an accident to a
 passenger alighting from a train, and relating a conversa-
 tion with counsel for plaintiff in another action as to the
 right of recovery and the subsequent death of the plain-
 tiff in such other action, is harmless error where the
 question of an excessive verdict has not been preserved for
 review.

6. SAME.

 Any misconduct of counsel for plaintiff in an action for
 damages for personal injuries in referring to the fact that
 certain persons were fortunate enough to receive their pay
 from the railroad company, meaning plaintiff's attending
 physician in particular, is harmless error, where the tes-
 timony relating to who had paid plaintiff's medical bill,
 on which the statement was based, was stricken out by
 the court and the jury warned to disregard it.

Error to Kalamazoo; Weimer, J. Submitted June
25, 1917. (Docket No. 120.) Decided September 27,
1917.

Case by Ben H. Sergeant against the Grand Rapids
& Indiana Railway Company for personal injuries.
Judgment for plaintiff. Defendant brings error. Af-
firmed.

*James H. Campbell,* for appellant.

*Lombard, Hext & Washburn,* for appellee.

STONE, J. This case comes before this court on writ
of error to the circuit court for the county of Kala-
mazoo, to review a judgment in favor of the plaintiff
on a verdict of $4,500, damages and costs, in an action
to recover damages for personal injuries sustained by
the plaintiff on February 2, 1916, in the city of Kala-
mazoo, about 9:30 o'clock p. m., when he was in the
employ of the defendant as a switchman in the yard
switching crew, and while engaged with the switch-

ing engine and others of the crew in proceeding to take a car out from the premises of the Kalamazoo Gas Company. The injury occurred when he stepped off the footboard at the front of the engine, as it reached the entrance of the gas company's premises, and was caught between the beam at the front of the engine and the post of the gate at the north side of the engine. The only negligence charged and relied upon against the defendant is that of the engineer, Wadsworth, in that he ran the engine at too great a rate of speed along the side track toward the car to be coupled onto, and failed to slow down or stop, on the signal given by plaintiff.

The switching crew consisted of Wadsworth, engineer; Layne, fireman; Neill and the plaintiff, switchmen. The tracks of the defendant run north and south at the location. The plant of the Gas Company is west of the railroad tracks and on the west side of Pitcher street, which the plant adjoins. Pitcher street runs north and south between the railroad tracks and the gas plant. The width of the street between curbs is 41 feet. There is a fence on the east side of the gas plant, being on the west side of Pitcher street. The side track enters into the premises of the gas plant through an opening or a gate in that fence. The distance from the post at the north side of the gate to the west curb of the paved part of the street was 11 feet 4 inches. The side track connects with another track at a point south of the entrance to the gas premises and east of Pitcher street. From that switch the side track runs northwesterly on a curve across Pitcher street to and onto the gas company's premises. The inside of the curb is on the southerly side of the side track. The distance measured along the side track from the switch to the entrance of the gas plant is 186 feet. The operation in which the plaintiff was injured was in proceeding to take out the car which

stood on the side track on the premises of the gas company, just inside of the entrance to the plant. The plaintiff testified that the car stood 4 or 5 feet inside the gate, while the engineer testified, "probably 2 feet, maybe 3 feet; I wouldn't want to say." The engineer and fireman were on the switch engine. The engine was headed north. The engineer was on the right-hand side of the cab of the engine, and on the outside of the curve facing the front of the engine. The fireman was on the left side, or inside, of the curve. All of the witnesses agree that another car had been moved and placed upon a side track away from the switch; that the engine was then backed south far enough to clear the switch; that the switch was thrown by the plaintiff; that the engine was started from a full stop and run onto the side track to the car to be taken out; that Neill, the other switchman, had been protecting Pitcher street—that is, he stood in the center of the street to warn people who might be passing on the street; that the plaintiff, after throwing the switch, stepped onto the right-hand side of the footboard at the front of the engine as it moved along the side track. He rode there until the engine arrived near the entrance to the gas plant, and then jumped off, and was caught between the beam at the front of the engine and the post at the north side of the entrance, and seriously injured. There was a conflict in the evidence as to the speed of the engine. The engineer testified that when the engine crossed Pitcher street it was moving 2 or 3 miles an hour. The fireman testified that it was going probably 4 miles an hour, which was the highest rate the engine made after leaving the switch, and that when the engine hit the car it was going about 2 miles an hour. Neill, the other switchman, who had stepped onto the footboard in front of the engine at the left side as the engine ran along the side track, and who stepped off before the

plaintiff did, testified that at the time he stepped off
the footboard of the engine it was going 5 or 6 miles
an hour, he should judge.  The following is a part of
his testimony:

"*Q.* Now, isn't it a fact that you got off that car
because it was going so fast you thought it was going
to bump into the other car?

"*A.* Yes, sir; I saw it was going to bump in all
right; that is the reason I got off, of course.

"*Q.* How fast was it going?  You have some idea
how fast that engine was going at that time?

"*A.* Five or six miles an hour, I should judge.

"*Q.* At that time you got off, it was going that fast?

"*A.* I should judge so; yes, sir.

"*Q.* At that time you jumped off from it, what was
the distance from the curb to the car?

"*A.* I think it went right up to the fence when I
went off.

"*Q.* You went clear up to the fence?

"*A.* I went clear up to the fence.  That would be
on the left-hand side of the engine.  I do not remem-
ber whether the engine slowed down any before it hit
the car or not.  I couldn't say."

The plaintiff testified as follows:

"*Q.* In crossing Pitcher street, did you give the en-
gineer any signals with reference to stopping or slow-
ing down?

"*A.* Yes, sir.  The front end of the engine was about
the center of the street when I made him the first
signal; that was the "easy" signal; that means slow
down.

"*Q.* How did you give it?

"*A.* With the lantern (indicating).  I was where
he could see me at that time.  I gave him another
signal after we had traveled a few feet.  It was done
quite quickly; it had to be.  I should judge the engine
was going about 10 or 11 miles an hour at the time
I gave him the signal.  It was a little over 2 rods
from this standing car.  We were towards 2 rods from
the standing car when I gave him the stop signal.
That was very soon after the other.  No attention

whatever was paid to the first signal I gave. No attention whatever was paid to the second signal.

"*Q.* Did the engine continue to keep up its speed?

"*A.* It forged ahead. At the time I jumped off, the speed of the engine was about 12 miles or more.

"*Q.* Why did you jump?

"*A.* To save myself from injury. The danger I jumped to keep away from was so I wouldn't get caught between this engine and this standing car.  *  *  *

"*Q.* In what way were you injured?

"*A.* I was caught between the end of the pilot beam and the gate post, and turned in between, as the engine went by the gate post. When I first discovered the standing car, I was on the footboard of the engine. The car was standing about 4 or 5 feet inside of the gate."

The engineer, in his testimony, denied that he got any signal from the plaintiff to slow down; he testified that he was where he could have seen signals of the plaintiff, had he given any; that he knew the plaintiff was there on the footboard on the right-hand side of the engine. He testified:

"The point at which I saw Sergeant on the running board, he was on the right side in plain view, until we struck the sidewalk; then I could not see him.  *. *  * He was not making any use of his lantern the last time I saw him. I did not see him make any use of it as I approached the car.  *  *  * At the time I proceeded through this gate and up to the car, I supposed that these two men (Neill and Sergeant) were on the running board. I did not see them. The supposition would be that there was the proper place for them to be. I had a right to expect they were there.  *  *  * I was going about 2 or 3 miles an hour when I crossed Pitcher street. Sergeant was on the running board at that time. I saw him at the time we crossed Pitcher street. It was in the open. The steam from the stack on the locomotive prevented my seeing him when we got farther along."

The engineer further testified that he drove the car, when he struck it, possibly 4 or 5 feet; that he pushed

it far enough so that, after he stopped the engine, the other switchman passed between it and the end of the engine to assist the plaintiff.

It is undisputed that the defendant had not, at the time of the injury, nor prior thereto, elected to be governed by the provisions of Act No. 10, Extra Session 1912 (2 Comp. Laws 1915, § 5423 *et seq.*), and in his declaration the plaintiff claimed the benefit of the provisions of said act.

The assignments of error relied upon relate to (1) the negligence of the engineer operating the engine; (2) improper and prejudicial arguments by plaintiff's counsel to the jury.

1. On the subject of the negligence of the engineer, it is urged that the court erred in refusing defendant's first request, that there could be no recovery, and the verdict must be for the defendant. Assignment No. 11, that the court erred in overruling defendant's motion, made at the close of the testimony, to direct a verdict for the defendant. This motion was made as prescribed by Act No. 217, Pub. Acts 1915 (3 Comp. Laws 1915, § 14568 *et seq.*). In its charge to the jury the trial court said:

"The vital question in this case is whether the engineer, Wadsworth, in the operation of the engine, was guilty of negligence; that is, whether he ran the engine towards the standing car in a careless, reckless, and negligent manner, and whether such negligence was the proximate cause of the injury."

Error is assigned upon the following part of the charge:

"You would be justified, if you find that the steam was blowing in the engineer's face, or in his vision, perhaps, I should say, to obscure his vision for any considerable, appreciable length of time, you would be justified in finding it was his duty to stop, and not proceed, when his vision was obscured. But if it was simply a momentary matter, an inappreciable length

of time, an instant, you would not necessarily be bound to say it was his duty to stop."

Also upon the following:

"It is the defendant's claim and theory, as stated through Mr. Wadsworth, that he was exercising due care and caution; that he was not running at a negligent rate of speed; that he was looking out for signals and did not see any; that the plaintiff did not give him any, or, if he did, the view was obscured. If that was the case, and it is for you to say whether or not it was, it was his duty to stop until his vision was cleared; and that would depend upon what you find, from the evidence, the amount of steam to have been, if any, and the duration of time it continued."

It is urged by appellant, in argument, that the controlling fact is that plaintiff had no business to be on the engine at all; that his duty and work did not require that he should ride or be upon the engine; and that he rode there voluntarily, and for his own convenience, rather than walk 186 feet, from the switch to the car to be coupled to. It is argued that:

"If an employee voluntarily stands upon the footboard of an engine moving toward a car to make a coupling, the employer owes to him no greater duty than it would owe to any trespasser, not to wantonly injure him, and would not be liable for any negligence less than gross negligence. The engineer owed no greater duty to the plaintiff. It is not a question of contributory negligence. The question is whether an employee can voluntarily place himself in a position of danger, where he is not required to be, and where he has no business to be, and, if he is injured, not wantonly, impose on his employer or fellow servant a duty and liability such as is sought to be imposed on the defendant in this case. I contend that he cannot. So far as the plaintiff is concerned, it is immaterial whether the engineer came against the car easy or hard, going 2 miles an hour, or 12 miles. He had no business to be on the footboard at all, when the impact was made or at any other time."

We cannot agree with counsel here. It is not necessary for us to say that the court will take judicial notice that switchmen usually ride upon the footboard of a switch engine, and that the footboard is for that purpose; for upon this record the only evidence upon the subject is that of the engineer, who testified that:

"The supposition would be that that [the footboard] was the proper place for them [the switchmen] to be. I had a right to expect they were there."

In our opinion, the only question upon this branch of the case is whether or not the engineer was negligent in the operation of the engine as it approached the car. The negligence predicated, and upon which recovery was based at the trial, was the claimed excessive rate of speed that the engine was operated, as it approached the standing car, because of which claimed excessive rate of speed, and failure of the engineer to obey signals to slow down and stop, given by the plaintiff, he, in an attempt at self-preservation was obliged to jump from the footboard upon which he was standing, rather than be jammed between the engine and the standing car. Upon the rate of speed there was a conflict in the evidence, and hence a question of fact for the jury. There were many circumstances tending to corroborate the testimony of the plaintiff as to the speed of the engine, the effect upon Neill when he alighted, the fact, as testified to by the engineer, that he drove the car when he struck it 4 or 5 feet, all of which circumstances were for the consideration of the jury. We are of the opinion that the court did not err in submitting, or in the manner of submitting, this question of the negligence of the engineer in the particular indicated, to the jury.

2. This brings us to consider the claimed improper and prejudicial arguments by plaintiff's counsel to the jury. In his argument to the jury one of plaintiff's counsel said:

"A short time ago — some years ago — I had the pleasure· of sitting with a lawyer in the trial of a case in which a woman had been injured. She was getting off the train, and the train had just started, and she says, 'Why, I want to get off'; and the conductor says, 'Hold on, I will help you off,' and kindly and gently took hold of her hand and assisted her down, and in doing so, gentlemen of the jury, it brought her arm around in that way (indicating) and injured one of those nerves in connection with the spinal cord.

"*Defendant's Counsel:* I will object; I will take an exception to that, and ask for a ruling on it.

"*Plaintiff's Counsel:* It is but an illustration.

"*The Court:* I do not understand counsel claims that for an argument.

"*Plaintiff's Counsel* (continuing) : I want to say to you, gentlemen of the jury, when counsel came to me and asked me to assist him in the trial of that case, I said to him, 'Where are the damages in this case; how can you show damages?' He says, 'Wait until the trial is over.' In less than two years from that time, gentlemen of the jury, that woman was asleep in her grave."

Counsel for appellant claim that the above statement was highly prejudicial on a material point, viz., the result of plaintiff's injury. There is no claim here that the verdict was excessive. That question was raised by a motion for a new trial. The motion was denied, and the reasons therefor were filed; but there was no exception filed, as appears by this record. The matter of excessive verdict, therefore, is not before us. The statement in no way has any bearing upon the questions at issue before this court. We doubt if the statement affected the merits of the case in any degree. Whether used as an illustration, or otherwise, it was improper matter; but we do not think it calls for a reversal of the judgment.

Another of plaintiff's counsel in his argument said:

"We find these local people here were, somehow or

another, fortunate enough to receive their pay from the railroad."

This referred to some of the medical testimony, and particularly to that of Dr. Ames, plaintiff's family physician. Upon objection, the court stated that the testimony had been stricken out, and that it was improper to comment upon it. In its charge the court referred to the subject as follows:

"An inquiry was made by counsel for the plaintiff of the plaintiff's family physician, Dr. Ames, as to who had paid the doctor's bill. I instructed you at the time to disregard that, and I am requested now to remind you of it again, and it is proper to do so. So I say to you that it is absolutely immaterial, for the purposes of this case, as to who paid Dr. Ames' bill. It appears that the plaintiff himself did not pay it; therefore he cannot recover for it. If he had paid it himself, it would be a question for you to determine whether or not he should recover for it in this case; but, not having paid it, it does not enter into this case at all, and has no bearing upon the issue here. It is no evidence of liability or negligence on the part of the defendant."

Why counsel for plaintiff referred to this matter, as relating to Dr. Ames, it is difficult to understand, as Dr. Ames was plaintiff's witness and physician. It is said that the reference was to another physician. If so, it might relate to the amount of damages or injury. Even if improper, we think this court would hesitate to reverse a case under the circumstances here shown, in view of the remarks of the trial court and the charge upon the subject.

Upon the whole record we are unable to find reversible error, and the judgment of the court below is therefore affirmed.

KUHN, C. J., and OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.